OPINION *Page 2 
{¶ 1} Defendant-appellant, Ernest Pope (hereinafter "Pope"), appeals the judgment of the Marion County Court of Common Pleas. For the reasons that follow, we affirm.
 {¶ 2} On June 14, 2006, the Marion County Grand Jury indicted Pope on four counts, including: possession of cocaine, in violation of R.C.2925.11(A)/(C)(4)(c) and a third degree felony; possession of crack cocaine in violation of R.C. 2925.11(A)/(C)(4)(e) and a first degree felony; tampering with evidence, in violation of R.C. 2921.12(A)(1) and a third degree felony; and illegal use or possession of drug paraphernalia, in violation of R.C. 2925.14(C)(1) and a fourth degree misdemeanor.
 {¶ 3} On September 11 and 12, 2006, a jury trial was held. The jury found Pope guilty on all four counts.
 {¶ 4} Thereafter, the trial court sentenced Pope to a mandatory term of five years imprisonment on count one of possession of cocaine; a mandatory term of eight years imprisonment on count two of possession of crack cocaine; five years imprisonment on count three of tampering with evidence; and thirty days in jail on count four of illegal use or possession of drug paraphernalia. The trial court further ordered that the sentences be served concurrently to each other for a total mandatory sentence of eight years imprisonment. *Page 3 
 {¶ 5} It is from this judgment that Pope appeals and asserts four assignments of error for our review. For clarity of analysis, we have combined Pope's second and third assignments of error.
 ASSIGNMENT OF ERROR NO. I DEFENDANT-APPELLANT WAS DENIED A FAIR TRIAL AS THE RESULT OF THE STATE'S DISCRIMINATORY USE OF ITS PREEMPTORY CHALLENGES SO AS TO PRECLUDE AFRICAN AMERICANS FROM HIS JURY.
 {¶ 6} In his first assignment of error, Pope argues the prosecution used its preemptory challenge to remove both African-American jurors, and thus, denied Pope due process and equal protections of the laws. According to Pope, a pattern of challenges against black jurors gives rise to an inference of discrimination. Pope further argues that the prosecution suggested that one of the African-American jurors, Miss Booker, had relatives under arrest or being prosecuted; however, the prosecution did not challenge Miss Booker for cause or inquire about her relatives, and if the prosecution believed that reason it could have challenged Miss Booker for cause and preserved the preemptory challenge.
 {¶ 7} "In Batson v. Kentucky, the United States Supreme Court held that `the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race.'" State v.Douglas, 3d Dist. No. 9-05-24, 2005-Ohio-6304, ¶ 28, quoting Batson v.Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712. This court has previously stated: *Page 4 
 Batson delineated a three-step procedure for evaluating claims of racial discrimination in peremptory strikes. "First, the opponent of the strike must make a prima facie showing of discrimination. Second, the proponent must give a race-neutral explanation for the challenge. Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful racial discrimination." State v. White (1999), 85 Ohio St.3d 433, 436, citing Batson, 476 U.S. at 96-98.
Id. at ¶ 29.
 {¶ 8} The trial court's determination that "the prosecutor did not possess discriminatory intent in the exercise of its preemptory challenges will not be reversed on appeal absent a determination that it was clearly erroneous." Id. at ¶ 35, citing State v. Hernandez (1992),63 Ohio St.3d 577, 583.
 {¶ 9} In the case sub judice, two African-Americans were dismissed pursuant to peremptory challenges by the prosecution. After Miss Booker, the second African-American to be challenged by use of a peremptory challenge, was dismissed from the jury, the following took place:
 THE COURT: Batson challenge, you're asking for race neutral explanation as to why —
 MS. MARTIN: Yes, this is the second one.
 THE COURT: You didn't say anything on the first one. I gave you an opportunity to and that gentleman is gone now.
 MS. MARTIN: I understand.
 THE COURT: You need to give me a race neutral reason as to why you're excusing Miss Booker.
 MS. LEIKALA: Yes, Your Honor. It's my understanding that we have just arrested a relative of hers named Quincy Booker that — a relative of hers is also Plez Booker and Stephanie Booker, and therefore she'd be biased against the State. *Page 5 
 MS. MARTIN: There's nothing from which she's indicated to give the State any —
 THE COURT: This is peremptory challenge. What you're asking for is a race neutral explanation as to why she's excusing this juror. That's race neutral. It's an appropriate challenge. Let's go.
(T. 87).
 {¶ 10} Later at the trial, the defense again brought the issue of the peremptory challenges to the trial court's attention and the following discussion took place:
 MS. MARTIN: Your Honor, a couple of things.
 At this time, first and foremost, what I do want to put on the record is the jury pool, my client, of course, is African American for purposes of the record, and that both African Americans on the jury that were called in the Voir dire were excused through peremptory challenges by the State of Ohio. With regard to Miss Booker specifically, I'm not certain on the basis of her relief from duty. There's some discussion that perhaps the name Booker has come up through other investigations. However, there is no conclusive proof, it doesn't sound like, that the State has that those are members of her own family. Therefore we would like noted and we don't feel as though that was good enough reason to excuse her on a peremptory.
 The jury pool right now, I believe, is comprised of seven white men and five white women.* * *
 THE COURT: As far as the racial composition of the jury, I know anybody reviewing this would not be able to glean from the order what happened. First of all, the first juror that was excused that was of African American descent, I believe Mr. Collins, the record should reflect that there was a fairly long pause before I said, "Okay, Mr. Collins, you're excused"; waiting for a challenge from you as far as the basis for this. None was forthcoming on that. There was the request to approach the bench when the State attempted to exercise a challenge on Miss Booker. The State gave, in my estimation, a *Page 6 race neutral explanation as to why they were exercising that challenge, and that's what I ruled on the record. Whether or not it's true, whether or not it's panned out, the reasons is there and it's an adequate reason to exercise that challenge. * * *
(T. 102-104).
 {¶ 11} "`Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.'"Douglas, 2005-Ohio-6304, at ¶ 31, quoting Hernandez, 500 U.S. at 359.
 {¶ 12} Since the prosecution, in this case, has offered a race-neutral explanation for using a peremptory challenge to challenge Miss Booker as a juror and the trial court determined that the challenge was appropriate, we need not discuss the first step in the Batson challenge. See Id.
 {¶ 13} The prosecution's race-neutral explanation for using a peremptory challenge to remove Miss Booker involved its understanding that Miss Booker was related to an individual who had recently been arrested. The trial court found that the prosecution had presented a race-neutral explanation for challenging Miss Booker, and therefore, the challenge was appropriate.
 {¶ 14} After reviewing the record, we cannot find that the trial court's determination was clearly erroneous. The mere fact that the prosecution could *Page 7 
have used a challenge for cause rather than peremptory challenge does not demonstrate that the trial court's determination was clearly erroneous. Accordingly, we overrule Pope's first assignment of error.
 ASSIGNMENT OF ERROR NO. II DEFENDANT-APPELLANT'S CONVICTION FOR POSSESSION OF COCAINE IS CONTRARY TO THE MANIFEST WEIGHT OF EVIDENCE.
 ASSIGNMENT OF ERROR NO. III DEFENDANT-APPELLANT'S CONVICTION FOR TAMPERING WITH EVIDENCE IS CONTRARY TO THE MANIFEST WEIGHT OF EVIDENCE.
 {¶ 15} Pope argues in his second assignment of error, the evidence does not establish that Pope had constructive possession of the cocaine; and thus, the manifest weight of the evidence is contrary to Pope's conviction for possession of cocaine. In his third assignment of error, Pope argues that since he did not possess the drugs, he could not have tampered with the evidence.
 {¶ 16} When determining whether a conviction is against the manifest weight of the evidence a reviewing court must examine the entire record, "`[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins *Page 8 
(1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting State v.Martin (1983), 20 Ohio App. 3d 172, 175, 485 N.E. 2d 717.
 {¶ 17} Credibility determinations are primarily a matter for the trier of fact since the trier of fact is in a better position to observe the demeanor of the witnesses and weigh their credibility. State v.DeHass (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.
 {¶ 18} Pope was convicted of possession of cocaine, possession of crack cocaine, and tampering with the evidence.[1]
 {¶ 19} Possession is defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "Possession of drugs can be either actual or constructive." State v. Cooper, 3d Dist. No. 9-06-49, 2007-Ohio-4937, ¶ 25, citations omitted; State v. Edwards, 5th Dist. No. 2004-CA-00060, 2004-Ohio-6139, ¶ 10, citations omitted. An individual has constructive possession "if he is able to exercise domination and control over an item, even if the individual does not have immediate physical possession of it." Cooper, 2007-Ohio-4937, at ¶ 25, citations omitted; Edwards, 2004-Ohio-6139, at ¶ 10, citations omitted. In order for "constructive possession to exist, `[i]t must also be shown that the person was *Page 9 
conscious of the presence of the object.'" Cooper, 2007-Ohio-4937, at ¶ 25, quoting State v. Hackerson (1982), 70 Ohio St.1d 87, 91;Edwards, 2004-Ohio-6139, at ¶ 10.
 {¶ 20} At the trial, Major Bill Collins testified that he is employed by the Marion Police Department and is assigned as the major in charge of the Investigative Bureau and MARMET Drug Task Force. (T. 135). Major Collins testified that he and Detective Isom made a traffic stop and encountered a subject who had crack cocaine. (T. 137). According to Major Collins, they had seen "that subject earlier at the Super 8 Motel, getting out of a vehicle with another black male and two black females and a small dog." (T. 137). Major Collins testified: the driver of that vehicle was John Conley; that they were later able to identify the black male as Dontel Boyce, the tall black female as Antonette Wilson, and the other female as her sister; and that they had left a known drug house in Marion. (T. 153-155). Major Collins testified that he assigned Detectives Ross and Utley to continue surveillance at the Super 8 Motel. (T. 137).
 {¶ 21} Major Collins and Detective Isom went back to the Super 8 Motel and observed a black car in the parking lot, and a black male, later identified as Ernest Pope, exited the vehicle and went into the lobby of the hotel. (T. 138). "At approximately that same time Detective Ross advised that they were watching a *Page 10 
green truck over in the Steak and Shake parking lot and some people had exited the back door of the hotel that might be the people we were looking for." (T. 138).
 {¶ 22} After receiving that information, Major Collins and Detective Isom took up a surveillance position in the parking lot of Meijers where they could see the green truck and "at that truck was the black male that we had just saw get out of the black vehicle out front and enter the lobby, which was Ernest Pope, and we also saw another black male that was in the purple car earlier with the other black male and the two black females and the dog." (T.138). Major Collins testified that the individuals got into the truck and began to leave the area. (T. 139). The driver of the truck was a white female, the front seat passenger was later identified as Dontel Boyce, the rear passenger behind the driver was Pope, and beside him in the back seat was a black female. (T. 139).
 {¶ 23} Major Collins testified that he followed the truck, as did Detectives Ross and Utley in their vehicle, and he saw the truck go left of the center yellow line and then back over to the right side of the road and went over the white line on the right side of the road several times. (T. 140). According to Major Collins, they called for a marked county deputy to make a traffic stop. (T. 140). Collins pulled into a parking area to let the deputy get in front of him and then pulled back out; and the truck pulled into a drive and then backed out. (T. 140). The deputy *Page 11 
passed the truck and then the deputy turned around and activated his emergency lights. (T. 140).
 {¶ 24} Further, Major Collins testified regarding the traffic stop:
 Q. Now, once you pull in front of the truck what happens?
 A. Once I pulled in front of the truck Detective — Deputy Brown was getting out of his vehicle, Detective Isom was in the passenger side of my vehicle. He began to get out of the vehicle, and I got out of the driver's side. Just from Police training and past experience it's my — it's my responsibility to keep an eye you know, on the people on the left hand side of the car as I'm facing it, and Detective Isom would approach from the right hand side, basically so we could see all the people in the vehicle.
 As we began to approach the vehicle I noticed the rear passenger behind the driver, which would be the black male in the blue hat and blue and white shirt later identified as Ernest Pope, lean way over in the back seat, clear on top of the rear passenger. And I couldn't tell at the time if he was trying to get something or if he was trying to put something down there, but obviously he was leaning over there for a reason —
 MS. MARTIN: Objection.
 THE COURT: I think we're getting into a little bit of a convulsion. Let's talk about observations, okay?
 MS. LEIKALA: Yes, your Honor.
 Q. When you say that you saw that rear passenger lean over —
 A. Correct.
 Q. — were you able to then see him?
 A. No, I wasn't. I was not able to see really any part of his body once he leaned way over and he continued to lay over in that position. At that time both Officer Isom and I had our service weapons drawn. He began — the front driver's door was open at that time and I could hear him yelling at the rear passenger to sit up, "show me your hands; sit up, show me your hands".
 * * *
 Q. What do you observe after that?
 A. At that time the rear passenger eventually complies with the order to sit up. Once he sits up he continually is moving around *Page 12 inside the vehicle. You can still not see his hands. At that point I can still hear orders being given to him to show his hands.
 Shortly thereafter somebody came up and assisted Detective Isom in extracting that person from the vehicle to get control of them.
 Q. Did you get a good look at that person who was leaning over?
 A. Once he was — once he sat up in the vehicle and was — he was extracted, yes, I did.
 Q. Do you see that person in the courtroom today?
 A. Yes, I do
 Q. Could you point him out and identify what he's wearing for the record?
 A. That would be Mr. Ernest Pope, blue and white shirt sitting beside defense counsel Martin."
(T. 141-143).
 {¶ 25} Major Collins also testified regarding statements that Pope made in reference to the drugs found in the vehicle. Major Collins testified:
 Q. When the cocaine was found in the truck was the Defendant standing outside the truck at the time?
 A. No he was not.
 Q. Where was he?
 A. He was in the back seat of the Sheriff's car that was parked behind the truck.
 Q. And that was Deputy Brown's car?
 A. Correct.
 Q. Were you talking over the radios where these drugs were found?
 A. No, we did not.
 Q. Did the Defendant make any statements to you at the jail?
 A. Yes, he did.
 Q. And could you tell the Court what the statement was?
 A. He had made comments at the jail when we identified him as Ernest Pope, he was like, "oh, you got me". He said, "What am I gonna be charged with, Collins"?
 A. I said, "Well, you're gonna be charged with the stuff in the truck". *Page 13 
 And his comment at that point was, "How can you charge me with that shit in the truck when I couldn't have reached way over there and put it on the floor"?
 Q. At any point in time did you tell him where the drugs were located?
 A. No, I did not.
 Q. Do you know if any other Officer told him where the drugs were located?
 A. No, they did not.
(T. 152-153).
 {¶ 26} On cross, Major Collins testified that he did not have the opportunity to search the vehicle prior to the stop and would not know what the contents of the vehicle were prior to the stop. (T. 160). In addition, Major Collins testified that he did not see Pope with the drugs. (T. 164).
 {¶ 27} Christy Utley, a detective at the Marion County Sheriff's Office, testified she was contacted by Detective Isom and Major Collins in reference to a vehicle they were watching, and some suspected drug activity occurring at a Super 8. (T. 111-113). Detective Utley testified: "[w]e were advised that there was some subject that had got out of a car earlier that day, so we were trying to locate the female." (T. 113).
 {¶ 28} According to Detective Utley, they located the female leaving from the rear of the Super 8, and there were two black males that were yelling at her. (T. 114). The female was walking towards Meijers, and one of the black males was yelling at her and pointing for her to go towards Steak and Shake, and she *Page 14 
went over to the Steak and Shake area. (T. 114-115). The female then got into the vehicle, a small extended cab pick up truck, which pulled into Steak and Shake, and the two black males from the Super 8 walked over. (T. 115) Detective Utley testified that a white male, a white female, a black female, and a black male were talking in the Steak and Shake parking lot. (T. 115). The individuals then loaded into the vehicle, and headed northbound on Pole Lane. (T. 116). Detective Utley testified: Cynthia McEntire, a white female, was driving; Dontel Boyce was sitting in the front passenger seat; the black female was sitting behind Boyce; Pope was sitting behind the driver; and the white male was sitting in the bed of the pickup truck. (T. at 116).
 {¶ 29} Detective Utley testified that she and Detective Ross in one vehicle, and Isom and Collins in another vehicle, followed the vehicle, the vehicle went left of center several times, and the vehicle was stopped. (T. 116-118). Detective Utley testified that she did not observe Pope with any drugs. (T. 121).
 {¶ 30} Deputy Bryan Brown, with the Marion County Sheriff's Office, testified that he joined the traffic stop involving a small dark colored pickup truck (T. 124). Deputy Brown testified: he saw Detective Isom getting out of his vehicle and running with his gun drawn, he did not see the movements; and he saw the subjects being pulled out of the vehicles by the other detective. (T. 125-26). *Page 15 
 {¶ 31} Antonette Wilson testified that she came down with her sister to Marion to visit with Dontel Boyce. (T. 186). Wilson testified: she got into the truck at Steak and Shake; she was sitting behind the passenger; Dontel Boyce was sitting in front of her; and a "dark-skinned dude" was sitting beside her. (T. 187-88).
 A. Yeah, soon as we got in the truck the dude that was beside me was like — we got down a little bit and I think he said something about somebody following us and then Dontel just start yelling at the lady that was driving and I wasn't — I was just scared because I didn't know what was going on, so I was just sitting there.
 * * *
 Q. Now, you said that you were in the truck and it was just driving, you don't know where it drove to?
 A. No, cause soon as we got in the truck I think we went through a light and something and got up a little bit and that's when Dontel started freaking out yelling at that lady that was driving and telling her `turn right here, turn right here', so she turned. There was just Police everywhere, so we had to —
 Q.What did you do when the Police came?
 A. I just sat there scared wondering what was going on. And then they came up to the car and the guy that was sitting beside me was just moving all around and on the way up right before we turned, before Dontel was like "turn right here right now", he had laid his head down — he had laid his head down in my lap for a second. He was just moving all around, I guess, because he was moving all around, the Police ran up on the car with their guns pulled and was like "quit moving, quit moving", and he kept moving and he's like "quit moving" and they pulled him out, and they had us get out
 Q. Now, you said the person that was sitting next to you put his head in your lap?
 A. He said, "can I put my head in your lap for a second"?
 I just looked at him, just for a second he just moved down for a second and raised back up. He just kept moving, then he *Page 16 started moving over on that side of the truck and that's when the cop was right there with the gun.
 Q. Okay.
 Now you said that he was moving around. Do you remember where he was moving around at?
 A. He was just moving over the back of the truck, moving around in the truck. I don't know what he was doing. I was just — I was so scared I really don't know. I just remember him moving around a lot in the back of the car before the Police pulled him out.
(T. 188-190).
 {¶ 32} Detective Andrew Isom, who is employed by the City of Marion and assigned to the drug task force, testified: they stopped a vehicle for several traffic violations; he then exited his vehicle and started to approach the vehicle. (T. 196-197). Detective Isom testified:
 Q. When you say you completely lost sight of him, what happened?
 A. He was sitting there one time and I saw him move to his right and I lost sight of him.
 Q. Okay.
 And in the car, or in the truck moving to his right, would that be moving towards the passenger? A. The right rear passenger, yes, ma'am.
(T. 197-198). Detective Isom testified that he drew his service weapon and yelled to the subject to "let me see his hands". (T.198).
 {¶ 33} Detective Isom pulled Pope out of the truck and put him on the ground on his stomach, and that he then saw what he believed to be digital scales sticking out of Pope's pocket. (T. 198). Detective Isom further testified that he removed the scales and $3,440 cash from Pope. (T. 204). The individual said he *Page 17 
was 16 years old and gave a different name. (T. 205). Detective Isom testified that Pope made the following statement that night at the jail:
 A. We had just got done identifying him and I think I wasexplaining to him what else he was being charged with becauseinitially when I removed those I [sic.] advised him he was beingcharged with Possession at the jail. I think I advised him that hewas also being charged with Trafficking in Narcotics, and hemade some kind of statement to the effect, without looking to myreport, something like, "yeah, you got me, you got me". And Iadvised him what else he was being charged with, he then madea statement that, "You can't put that shit on me. There's noway I could put that shit all the way over there on the floor", something like that.
 Q. Do you know if the Defendant was present when the drugs were found?
 A. He was not. He was in the left rear — behind the driver's seat of Deputy Brown's car.
 Q. Do you know if any conversation over the radio was relayed as to where the drugs were found?
 A. There wasn't.
 Q. There was?
 A. There was no radio traffic.
 Q. So could he have learned of its location over the radio?
 A. No, ma'am.
(T. 207-208). Detective Isom testified that he did not see Pope either possess the drugs in the baggies or place those drugs under the seat. (T. 217).
 {¶ 34} Duane Meadows and Lee Blair, sergeants with the Marion County Sheriff's Office, both testified at the trial. Sergeant Meadows testified that the vehicle had already been stopped when he got there; the vehicle was a green Dodge Dakota extended cab pick up truck; the driver of the truck gave permission to search the truck, he searched the passenger side of the truck and found a plastic *Page 18 
bag with a "white powder substance that appeared to possibly be cocaine under the seat." (T. 177-179). According to Meadows, Major Collins moved the seat, and they saw three individual bags, "one with a white powdered substance, and two additional plastic bags with what appeared to be crack cocaine." (T. 179). Sergeant Blair testified that he checked the three bags, and found some that small smudges or partial prints but nothing could be dusted for identification purposes. (T. 226, 230).
 {¶ 35} The prosecution and the defense stipulated that Anthony Tambasco, a criminalist, would testify that he analyzed the substances marked as State's Exhibits 1A, 1B, and 1C, and that the substances consisted of 12.10 grams of crack cocaine, 20.94 grams of crack cocaine, and 58.57 grams of cocaine. (T. 170-173). The prosecution also presented pictures of the location in which the illegal drugs were discovered.
 {¶ 36} The defense did not present any witnesses.
 {¶ 37} In State v. Cooper, the defendant was convicted of one count of possession of cocaine, one count of tampering with evidence, and one count of possession of heroin. Cooper, 2007-Ohio-4937, at ¶ 1. In that case, Cooper was seated in the front passenger seat, and the drugs were found in the seat pocket on the back of the seat in which Cooper was sitting. Id. at ¶¶ 4, 27. The prosecution did not present "any evidence that Cooper was conscious that the heroin and *Page 19 
cocaine were located in the pocket behind the seat." Id. at ¶ 29. Although the defendant indicated that he knew there were drugs inside the vehicle, he did not know where the drugs were located or who had the drugs. Id. Further, there was no evidence that Cooper had made any attempt to reach the drugs or the area in which the drugs were located. Id. Accordingly, we found that the prosecution failed to provide sufficient evidence to support Cooper's convictions for possession of cocaine and heroin. Id. at ¶¶ 29, 1.
 {¶ 38} In the present case, Pope made furtive movements in the area where the drugs were located, and Pope's statements indicate that he had knowledge of the drugs and where the drugs were located. This evidence established an inference of guilt. Thus, the present case is clearly distinguishable from the Cooper case, in which the prosecution did not present any evidence that Cooper made any movements toward the location of the drugs nor that he had knowledge of where the drugs were located.Cooper, 2007-Ohio-4397, at ¶ 29.
 {¶ 39} After reviewing the record, we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice when it found Pope guilty of possession of cocaine, possession of crack cocaine, and tampering with evidence. Accordingly, we overrule Pope's second and third assignments of error.
 ASSIGNMENT OF ERROR NO. IV DEFENDANT-APPELLANT RECEIVED PREJUDICIALLY INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION *Page 20 OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS, AS WELL AS HIS RIGHTS UNDER SECTION 10, ARTICLE I, OHIO CONSTITUTION.
 {¶ 40} In his fourth assignment of error, Pope maintains his trial counsel was ineffective for failing to object to the prosecution's use of preemptory challenge of Mr. Collins.
 {¶ 41} "It is well-settled that in order to establish a claim of ineffective assistance of counsel, appellant must show two components: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant." State v. Price, 3d Dist. No. 13-05-03, 2006-Ohio-4192, ¶ 6, citing State v. Kole (2001), 92 Ohio St.3d 303, 306,750 N.E.2d 148, citing Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 80 L.Ed.2d 674. "To warrant reversal, the appellant must show that there is a reasonable probability that, but for counsel's performance, the result of the proceeding would have been different." Id., citing Strickland, 466 U.S. at 687.
 {¶ 42} After reviewing the record, we find that there is no indication that objecting to the prosecution's use of a preemptory challenge of Mr. Collins as a juror would have affected the outcome of the trial. Accordingly, the defendant has failed to establish that there is a reasonable probability that, but for trial counsel's failure to object to the challenge of Mr. Collins as a juror, the result of the trial *Page 21 
would have been different. Pope's fourth assignment of error is, therefore, overruled.
 {¶ 43} Having found no error prejudicial to appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 SHAW and WILLAMOWSKI, JJ., concur.
[1] Pope was also convicted of illegal use or possession of drug paraphernalia; however, Pope's second and third assignments of error do not discuss Pope's conviction for possession of drug paraphernalia. *Page 1