[Cite as *State v. Rodgers*, 2011-Ohio-3003.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO.  5-10-35

    v.

MACK J. RODGERS,                  O P I N I O N

    DEFENDANT-APPELLANT.

**Appeal from Hancock County Common Pleas Court**
**Trial Court No. 2009-CR-229**

**Judgment Affirmed**

**Date of Decision:   June 20, 2011**

**APPEARANCES:**

    *Sarah G. LoPresti*  **for Appellant**

    *Mark C. Miller*  **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Mack J. Rodgers (hereinafter "Rodgers"), appeals the judgment of conviction and sentence entered against him by the Hancock County Court of Common Pleas, following a jury trial in which Rodgers was found guilty of one count of aggravated possession of drugs. For the reasons that follow, we affirm.

{¶2} On November 19, 2009, the Hancock County Grand Jury returned an indictment against Rodgers charging him with one count of aggravated possession of drugs in violation of R.C. 2925.11(A), a felony of the second degree. The indictment listed the drugs at issue as Methylenedioxymethamphetamine in an amount that was equal to or exceeded five times the bulk amount, but less than fifty times the bulk amount.

{¶3} On December 14, 2009, December 16, 2009, and March 10, 2010, Rodgers filed motions to suppress. Eventually, hearings on the motions to suppress were heard on March 10, 2010 and April 17, 2010. Subsequently, on May 19, 2010, the trial court overruled Rodgers' motions to suppress.

{¶4} On September 27, 2010, the State filed a motion to amend the indictment for purposes of changing the identity of the substance at issue, which it claimed was really N-Benzylpiperazine, in an amount that was equal to or exceeded five times the bulk amount, but less than fifty times the bulk amount.

{¶5} On September 27, 2010, a hearing on the State's motion was conducted, at which time, both parties presented their arguments. Thereafter, the trial court granted the State's motion to amend the indictment.

{¶6} The matter proceeded to trial on September 27-28, 2010. After the presentation of evidence, the jury ultimately found Rodgers guilty of aggravated possession of drugs.

{¶7} On October 5, 2010, a sentencing hearing was held, wherein the trial court sentenced Rodgers to seven (7) years in prison.

{¶8} Rodgers now appeals and raises the following two assignments of error. For ease of our discussion, we elect to address Rodgers' second assignment of error first.

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT VIOLATED MACK RODGERS' RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN, IN THE ABSENCE OF SUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, MR. RODGERS WAS FOUND GUILTY OF THE AGGRAVATED POSSESSION OF DRUGS. FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION. (October 7, 2010 Judgment Entry).**

{¶9} In his second assignment of error, Rodgers argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.

**{¶10}** Reviewing a challenge to the sufficiency of the evidence requires this Court to examine the evidence in the light most favorable to the prosecution. The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668.

**{¶11}** Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. Id. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly

-4-

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶30, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387.

{¶12} Here, Rodgers was charged with aggravated possession of drugs pursuant to R.C. 2925.11(A), which states that "no person shall knowingly obtain, possess, or use a controlled substance. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B)

{¶13} At trial, the State presented testimony from Trooper Kurt Beidelschies of the Ohio State Highway Patrol, Findlay Post No. 32. Trooper Beidelschies testified that he was working the 11 pm to 7 am shift on November 10, 2009 on Interstate 75, when around 11:30 p.m., he observed a vehicle drive past him traveling faster than the posted speed limit. (Sept. 27, 2010 Tr. at 149-51). Trooper Beidelschies said that he used his laser check twice and it indicated that the vehicle was traveling 83 mph and 82 mph in a 65 mph zone. (Id. at 151). As a result, Trooper Beidelschies said that he executed a stop of the vehicle. (Id. at 151-52). Trooper Beidelschies testified that Rodgers had been driving the

vehicle, and that there had been a passenger seated in the front passenger's seat, later identified as Armond Price. (Id. at 151-52).

{¶14} Trooper Beidelschies stated that he explained to Rodgers the reason for the traffic stop and asked him for his driver's license, registration, and proof of insurance. (Id. at 152). Rodgers did not give Trooper Beidelschies a driver's license, but instead gave him a Michigan state identification, which had a Michigan State parole card stuck to the back of it. (Id.). Additionally, Price explained to Trooper Beidelschies that the vehicle was a rental and that it was rented to Price's wife, Sierre Price. (Id.). Price gave Trooper Beidelschies the rental agreement, along with an Ohio driver's license. (Id. at 153).

{¶15} At that point, Trooper Beidelschies testified that he had Rodgers come with him and had Rodgers sit in the front seat of his patrol car while he conducted a check of Rodgers' driver status. (Id.). Trooper Beidelschies said that he asked Rodgers about his parole card because typically, as a condition of release in any state, a person is not permitted to leave the state without getting permission. (Id. at 153-54). In response, Rodgers indicated that he was on parole for aggravated robbery and an attempted murder charge, and indicated that his parole officer did not know that he had left the state, even though it was a condition of his supervision. (Id.). Trooper Beidelschies testified that Rodgers' license came back as being suspended. (Id).

{¶16} Trooper Beidelschies stated that soon after running the check on his license, Rodgers admitted to speeding. (Id. at 155). Trooper Beidelschies also said that he explained to Rodgers that the rental agreement specifically stated that no other drivers were permitted to drive the car except for Sierre Price, and that it was actually set to expire at midnight that day, which was only approximately 15 minutes from the time of the stop. (Id.). At that point, Rodgers explained to Trooper Beidelschies that he had been driving Price down to Columbus and was going to immediately return to Michigan to return the rental vehicle; however, Rodgers admitted that by the time he dropped off Price in Columbus and drove the car back to Michigan to the rental agency the agreement would be expired. (Id.).

{¶17} Trooper Beidelschies testified that by this time in the stop Rodgers appeared "extremely nervous" and that he was "very fidgety, overly nervous." (Id. at 156). Consequently, based on the circumstances, Trooper Beidelschies said he requested canine assistance from the Hancock County Sheriff's Office. (Id. at 156). Trooper Beidelschies testified that Deputy Smith arrived within five minutes with his canine, Becky, who positively alerted to the odor of narcotics coming from somewhere inside the vehicle after doing a walk around the vehicle. (Id. at 156-57). Subsequently, Trooper Beidelschies placed both Rodgers and Price in the back of his cruiser, explained to them that based on the canine's alert they were going to search the vehicle, and asked them whether either of them had

-7-

used any narcotics recently in the vehicle. (Id.). Price indicated that he smoked marijuana and reasoned that that was why the dog had alerted to the vehicle. (Id.).

{¶18} Then Trooper Beidelschies said that he, Deputy Smith, and Trooper Kline from the Ohio State Highway Patrol, Findlay Post No. 32, conducted a search of the vehicle. (Id. at 157-60). Eventually, they discovered two plastic baggies inside the armrest in the center of the back seat of the vehicle that contained blue and green pills. (Id. at 158-60); (State's Exs. 1, 1-A, 2, 2-A).

{¶19} Trooper Beidelschies explained that after they searched the vehicle, he took Price and Rodgers back to the station and searched the two men. (Id. at 178). In particular, Trooper Beidelschies found two Vicodin pills on Price after he shook Price's pant leg. (Id.). Based on what Trooper Beidelschies had heard from the in-car audio recording and the fact that the pills had rolled out from Price's pant leg, Trooper Beidelschies concluded that the pills had been previously inserted in Price's anal cavity. (Id.). In addition to the two pills found on Price, Trooper Beidelschies also found four additional similar Vicodin pills inside his patrol car. (Id.).

{¶20} Trooper Beidelschies also testified that along with a video recording device in the front of his patrol cruiser, there were digital recording devices on his person and inside his patrol cruiser as well. (Id. at 164). Both devices were

working properly on the night in question.[1]  (Id. at 164-65).  At trial, Trooper Beidelschies played the video and audio recording of the traffic stop and explained both the visual and audio recordings taken that night.  (Id. at 169); (State's Ex. 5).

{¶21} In particular, in the audio recording, Trooper Beidelschies can be heard talking to Rodgers in his cruiser about the possibility of bond given Rodgers' suspended license.  (State's Ex. 5).  In addition, Trooper Beidelschies also can be heard informing Rodgers that in light of the rental agreement and the fact that neither Rodgers nor Price was permitted as a driver of the vehicle he would have to contact Enterprise Rental Company and determine how the company wanted to proceed.  (Id.).  Furthermore, later on in the audio, while the law enforcement officers were outside the cruiser, Price and Rodgers can be heard discussing which person should take the fall for the pills found in the vehicle.  (Id.).  While Price does most of the talking and tries several times to convince Rodgers to admit to being responsible for the drugs, at one point Rodgers refuses to go along and tells Price "we came up there together with this shit, man."  (Id.).  In addition, Rodgers can be heard telling Price several times that they have to "fight this," and at certain times, Rodgers can also be heard explaining to Price

---

[1] We also note that there is evidence in the record that there were two visible signs in Trooper Beidelschies' patrol cruiser which indicated that all conversation inside the patrol vehicle were subject to audio and video recording.

that the vehicle they were driving is a rental and that the drugs could belong to anyone. (Id.).

{¶22} On cross-examination, Trooper Beidelschies acknowledged that on the recording Rodgers denied that the pills were his and that he was "going to fight this." (Id. at 183-84). However, Trooper Beidelschies later explained that he believed Rodgers had made that statement because he did not believe Trooper Beidelschies could prove the pills belong to him based on the fact that they were found in a rental car. (Id. at 183-84, 188). Trooper Beidelschies also stated that it was only Price, not Rodgers, who had admitted to smoking marijuana. (Id. at 184-85). Moreover, the Vicodin pills had only been found on Price. (Id. at 184-85). Furthermore, Trooper Beidelschies testified that there was nothing attributable to Rodgers with respect to the rental agreement since the rental agreement had been in Price's wife's name. (Id. at 186). Finally, Trooper Beidelschies acknowledged that a vast majority of the spoken words on the recording belonged to Price and not Rodgers, and that Price repeatedly asked Rodgers that if he admitted to the drugs, he would put together something for him. (Id. at 186). Nevertheless, Trooper Beidelschies explained that even though Rodgers made statements that he did not know anything about the drugs, Trooper Beidelschies believed that Rodgers had made those comments in reference to the fact that they had been

driving a rental vehicle and so the officers could not tie the drugs to either of them. (Id. at 189-91).

{¶23} Next to testify was Deputy Frederick R. Smith of the Hancock County Sheriff's Office, who was assigned to the canine patrol and paired with his canine partner, Becky, on the day in question. (Id. at 196). Deputy Smith testified that on November 10, 2009, he received a call for a canine sniff between the river and State Route 12 on southbound I-75. (Id. at 198-99). Deputy Smith said that after he spoke to Trooper Beidelschies at the scene, he and Becky did a search of the exterior of the vehicle. (Id. at 199). Deputy Smith explained that typically he and his canine partner will do two sweeps of the vehicle, but in this particular case, Becky positively reacted to the driver's door seam on their first sweep of the vehicle. (Id. at 199). At that point, Deputy Smith said that he, along with Trooper Beidelschies and Trooper Kline, conducted a search of the interior of the vehicle and located two bags of blue and green pills in the back seat center armrest. (Id. at 200). On cross-examination, when asked whether Becky could tell the difference between MDMA and N-Benzylpiperazine, Deputy Smith stated that Becky was trained and certified in marijuana, cocaine, heroin, and Methaphetamines, and any derivatives of those four basic odors. (Id. at 202).

{¶24} Finally, Heather Brin Sheskey, a chemist with the Ohio Highway Patrol crime lab, testified. Sheskey said that she performed the analysis on the

-11-

pills retrieved from the vehicle searched on November 10, 2009. (Sept. 28, 2010 Tr. at 216). After running the standard tests, based on her education, training and experience Sheskey concluded that the tablets in both baggies contained N-Benzylpiperazine, otherwise known as BZP. (Id. at 220). There were one hundred (100) tablets in State's Exhibit 1 and 1-A, and ninety-nine (99) whole tablets and one (1) partial tablet in State's Exhibit 2 and 2-A. (Id.). Sheskey explained that BZP is a Schedule I drug in Ohio and that the bulk amount in Ohio is ten tablets. (Id. at 221). On cross-examination, Sheskey explained that, while MDMA is also known as Ecstasy, she was not sure whether BZP had Ecstasy-like effects given the fact that MDMA and BZP are not the same chemical. (Id. at 223). Nevertheless, Sheskey said that while the two drugs are separate chemicals, MDMA and BZP are both Schedule I drugs, and are both equally illegal to possess in Ohio. (Id. at 223).

{¶25} After Sheskey's testimony and the admission of the State's exhibits, the State rested, and the defense raised a Crim.R. 29 motion for acquittal arguing that the State had failed to present sufficient evidence that Rodgers had known about the drugs or had possessed the drugs involved in the incident. (Sept. 28, 2010 Tr. at 231-33). The trial court overruled the defense's motion for acquittal, at which time the defense rested without calling any witnesses or presenting any

additional evidence.  (Id. at 234-35).  Consequently, the matter was submitted to the jury, and eventually they returned a verdict of guilty.  (Id. at 274-75).

{¶26} Now on appeal, Rodgers claims that there was insufficient evidence to establish that he (1) acted knowingly and (2) either actually or constructively possessed the drugs that were found in the car's backseat armrest.  We disagree.

{¶27} With respect to whether Rodgers had knowledge of the drugs, R.C. 2901.22(B) defines knowingly as follows: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist."  Moreover, when the disputed issue is the defendant's culpable mental state, direct evidence will usually not be available and, as such, proof must be derived from circumstantial evidence. See *Jenks*, 61 Ohio St.3d 259, paragraph one of the syllabus.  Circumstantial evidence has the same probative value as direct evidence.  See id.

{¶28} At trial, there was testimony that Rodgers appeared "extremely nervous" and that he was "very fidgety" when speaking to Trooper Beidelschies in his cruiser.  In addition, in the audio recording Rodgers and Price can clearly be heard discussing the drugs in question and attempting to formulate a defense strategy *prior to* the law enforcement officers discovering the drugs in the vehicle. We find that when viewing this evidence in a light most favorable to the State a

-13-

rational trier of fact could have found that Rodgers was aware of the probability of the existence of drugs in the vehicle, especially considering the fact that the two men were discussing who should take responsibility for the drugs in the vehicle prior to law enforcement officers finding the drugs.

{¶29} Furthermore, with respect to the issue of possession, possession has been defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). However, "[p]ossession of drugs can be either actual or constructive. *State v. Pope*, 3d Dist. No. 9-06-61, 2007-Ohio-5485, ¶19, citing *State v. Cooper*, 3d Dist. No. 9-06-49, 2007-Ohio-4937, ¶25; *State v. Edwards*, 5th Dist. No. 2004-CA-00060, 2004-Ohio-6139, ¶10. An individual has constructive possession "if he is able to exercise domination and control over an item, *even if the individual does not have immediate physical possession of it.*" *Pope*, 2007-Ohio-5485, at ¶19, citing *Cooper*, 2007-Ohio-4937, at ¶25 (emphasis added); *Edwards*, 2004-Ohio-6139, at ¶10. "All that is required for constructive possession is *some measure* of dominion or control over the drugs in question, beyond mere access to them." *State v. Norman*, 10th Dist. No. 03AP-298, 2003-Ohio-7038, ¶31, citations omitted (emphasis added). "[D]ominion and control may be proven by circumstantial evidence alone." *State v. Stewart*, 3d Dist. No. 13-08-18, 2009-

Ohio-3411, ¶51, citing *State v. Trembly* (2000), 137 Ohio App.3d 134, 141, 738 N.E.2d 93.

{¶30} Here, there was evidence that, again when viewed in a light most favorable to the State, a rational trier of fact could have found that Rodgers had constructive possession of the drugs. While the vehicle involved was a rental vehicle, neither Rodgers nor Price was listed as a permitted driver on the rental agreement, and Rodgers was in fact the person driving the vehicle when Trooper Beidelschies executed the stop. Moreover, Rodgers told Trooper Beidelschies that he was the one responsible for returning the rental vehicle back to Michigan after he dropped off Price in Columbus. Furthermore, there was no evidence presented that Price ever drove the rental vehicle that night. As Rodgers stated in his appellate brief, his mere proximity to the pills found in the rental vehicle is alone insufficient to establish constructive possession; however, proximity to the object does constitute some evidence of constructive possession, and proximity may, coupled with another factor or other factors, establish constructive possession. *State v. Kingsland*, 177 Ohio App.3d 655, 2008-Ohio-4148, 895 N.E.2d 633, ¶13, citing *State v. Fry*, 4th Dist. No. 03CA26, 2004-Ohio-5747, ¶39. Here, in addition to the fact that Rodgers was the driver and responsible for returning the rental vehicle, there was the audio recording that evidenced Rodgers' and Price's conversation in the back of the cruiser. In the audio recording, Rodgers not only

refuses to take sole responsibility for the drugs because "we came up there together with this shit, man," but Rodgers makes several references to the fact that since they were driving a rental vehicle the cops would not be able to determine who was responsible for the drugs. When viewing this evidence in a light most favorable to the State, we believe that a rational trier of fact could have concluded that Rodgers had constructive possession of the pills in the rental vehicle.

{¶31} Finally, Rodgers also claims that his conviction was against the manifest weight of the evidence. Rodgers again maintains that the State failed to prove that he had knowledge and possession of the drugs in the vehicle. In particular, Rodgers first claims that Trooper Beidelschies mischaracterized the conversation between Rodgers and Price in the audio recording exhibit. Rodgers argues that his statement to Price that "we came up there together with this shit, man" was not an admission that he knew about the drugs but rather was nothing more than an acknowledgement that both parties would likely be blamed for the drugs. Rodgers also asserts that the evidence in actuality showed that Price, not Rodgers, was the person most likely responsible for the drugs found in the rental vehicle given the fact that the rental vehicle was in Price's wife's name and the fact that the Vicodin pills were found on Price.

{¶32} However, Trooper Beidelschies' testimony and credibility were matters for the trier of fact to weigh and determine. In addition, the possibility

that Price was the sole person responsible for the drugs was also a matter for the trier of fact to weigh and determine. Nevertheless, there was evidence that Rodgers appeared "extremely nervous" and that he was "very fidgety, overly nervous" when speaking to Trooper Beidelschies. In addition, the drugs were found in the center armrest in the back seat of the rental vehicle, so the pills were accessible to both parties. While neither party admitted to knowing anything about the drugs to the law enforcement officers directly, the audio recording clearly indicates that both parties knew about the presence of the drugs in the rental vehicle even before the drugs were found by the law enforcement officers. Moreover, at one point in the audio recording, Price tries to convince Rodgers to take responsibility for the drugs in the vehicle, but Rodgers refuses to go along and tells Price "we came up there together with this shit, man." Furthermore, during their conversation, Rodgers makes several references to the fact that since they were driving a rental vehicle the cops would not be able to determine who the drugs belonged to.

{¶33} Overall, given all of the above circumstances, specifically the statements made by Rodgers in the audio recording, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that Rodgers' conviction must be reversed.

{¶34} Rodgers' second assignment of error is, therefore, overruled.

-17-

## ASSIGNMENT OF ERROR NO. I

**MACK RODGERS WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION. (T.pp. 7-14).**

{¶35} In his first assignment of error, Rodgers claims that he was denied effective assistance of trial counsel when his trial counsel failed to ask for a continuance after the trial court allowed the State to amend the indictment the day of trial.

{¶36} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole* (2001), 92 Ohio St.3d 303, 306, 750 N.E.2d 148, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 687.

{¶37} Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie* (1998),

-18-

81 Ohio St.3d 673, 675, 693 N.E.2d 267. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965. Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373, quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623.

{¶38} Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley*, 42 Ohio St.3d at 142, citing *Strickland*, 466 U.S. at 691. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley*, 42 Ohio St.3d at 142; *Strickland*, 466 U.S. at 694.

{¶39} Here, on September 27, 2010, the State filed a motion to amend the indictment. Essentially, the State had discovered that the substance found in the vehicle driven by Rodgers was not Methylenedioxymethamphetamine ("MDMA"), but actually N-Benzylpiperazine (otherwise known as "BZP"). The State notified Rodgers' trial counsel three days prior to the filing of the motion of its intent to file the request. (Sept. 27, 2010 Tr. at 5, 12). As a result, prior to trial on September 27, 2010, a hearing was conducted, during which Rodgers' defense counsel stated on the record that it had been part of his defense strategy to argue that the substance identified and listed in the report was not the substance named

in the original indictment, identified by Trooper Beidelschies, and alerted to by the canine. (Id. at 7-8). Nevertheless, the trial court granted the State's motion to amend its indictment finding that there was no prejudice to Rodgers since the amendment did not change the essential identity of the offense nor did it change the level of offense. (Id. at 12). Thereafter, the matter proceeded immediately to jury trial.

{¶40} On appeal, Rodgers claims that he was denied effective assistance of trial counsel because his trial counsel failed to request a continuance after the trial court allowed the State to amend the indictment the day of trial. Rodgers argues that given his trial counsel's statements at the hearing, it is clear that his defense strategy was largely based on the lack of evidence that the drug listed in the indictment was ever in Rodgers' possession. Rodgers claims that had his counsel asked for a continuance, he would have had time to prepare a defense focused on the lack of evidence that Rodgers had any knowledge of the drugs in the vehicle.

{¶41} After reviewing the record, we do not believe that Rodgers' trial counsel's performance was deficient or unreasonable under the circumstances. As this Court has previously noted, "debatable strategic and tactical decisions may not form the basis of an ineffective assistance of counsel claim, even if a better strategy might have been utilized." *State v. Wilson*, 3d Dist. No. 1-09-53, 2010-Ohio-2947, ¶14, citing *State v. Utz*, 3d Dist. No. 3-03-38, 2004-Ohio-2357, ¶12,

-20-

citing *State v. Phillips* (1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643. Here, the decision of Rodgers' trial counsel to not request a continuance could be termed a tactical choice. Moreover, we disagree with Rodgers' argument and find after reviewing the record that his trial counsel did not admit that he was unable to present any defense in light of the amendment to the indictment. (See Sept. 27, 2010 Tr. at 8-9). Not only that, but as the trial court stated at the hearing, allowing the amendment did not prevent Rodgers' trial counsel from presenting a defense that the officers had misidentified the drug found in the vehicle. (Id. at 11-13). In fact, Rodgers' defense counsel still presented this strategy during the trial, in particular with respect to challenging Trooper Beidelschies' credibility and when questioning the chemist with the Ohio Highway Patrol crime lab, which we highlighted above.

{¶42} Even if Rodgers' trial counsel's performance was deficient or unreasonable, Rodgers has failed to demonstrate that he was prejudiced. First of all, we note that there was no Civil Rule 7(D) violation to which Rodgers' trial counsel should have requested a continuance. The amendment to the indictment did not change the identity of the offense (it was still an aggravated possession of drugs), nor did it change the level of offense (since both MDMA and BZP are Schedule I drugs). See R.C. 3719.41, Schedule I(E)(2). Nonetheless, Rodgers claims that if his trial counsel would have asked for a continuance he could have

presented a defense focused on the lack of evidence that Rodgers had any knowledge of the drugs in the vehicle.[2] While Rodgers asserts that this alternative defense strategy may have changed the outcome of the trial, it is clear from the record that Rodgers' trial counsel *did in fact* present this lack of knowledge theory during trial. At trial, Rodgers' trial counsel's cross-examination of Trooper Beidelschies significantly focused on the fact that Rodgers denied knowing about the pills to Trooper Beidelschies. Therefore, because the amendment did not prejudice Rodgers and because, despite Rodgers' arguments to the contrary, this "alternative defense strategy" was actually presented at trial, we find that Rodgers has failed to demonstrate prejudice.

{¶43} Rodgers' first assignment of error is, therefore, overruled.

{¶44} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, P.J. and SHAW, J., concur.**

**/jlr**

---

[2] We also note that the BCI report indicating the identity of the drug found in the vehicle was included in discovery three months prior to trial. So the only surprise Rodgers' defense counsel could have claimed occurred in support of a continuance would have been the fact that the State had not notified of him of its intent to amend the indictment until three days prior to trial.